AMERICAN SECURITY AND TRUST COMPANY, a corporation, and Trustee u/w of Abraham D. Hazen, deceased, Plaintiff,

v.

Mary Duffey CRAMER et al., Defendants.

Civ. A. No. 3987-55.

United States District Court District of Columbia.

July 7, 1959.

Benton C. Tolley, Jr., Washington, D. C., for plaintiff.

LeRoy J. Haugh, Washington, D. C., for defendants Cramer.

Joseph A. Rafferty, Washington, D. C., for defendants Duffey and Voss.

Jeff Busby, Washington, D. C., guardian ad litem for minor defendants Duffey.

Donald M. Sullivan, Washington, D. C., for defendant Blakelock.

Charles W. Arth, Washington, D. C., for defendant Hazen.

YOUNGDAHL, District Judge.

Six of the eleven [1] defendants before the Court have moved for summary judgment. A hearing has been held and memoranda of points and authorities have been submitted. Plaintiff, trustee of a testamentary trust, is a stakeholder in this controversy among competing heirs. Since all the material facts have been stipulated,[2] the Court is free to render summary judgment.

Abraham D. Hazen, a resident of the District of Columbia, died in the District on December 4, 1901. His will, executed on October 16, 1900, was admitted to probate on March 11, 1902.

Testator was survived by Hannah E. Duffey, who is referred to in his will as his "adopted daughter". At the time of the testator's death, Hannah had two

1. Defendants Mary, Hugh, Shannon and Calvin Cramer, and defendants Diane Voss and David Blakelock constitute the six. There has been a suggestion of the death of defendant Edith Sullivan. The four defendants who have not joined in or opposed the motions for summary judgment are defendants Margaret, Depue and Ellinor Duffey (the latter two being represented by their guardian, Jeff Busby) and Anita Hazen. Default has previously been taken against the other twenty-one defendants.

The motions by the six defendants embrace all the issues in dispute.

2. The stipulation of facts was signed by counsel for plaintiff and all eleven defendants. Whether Hannah Duffey was ever legally adopted by the testator has not been agreed upon. Hannah's status is not a "material" fact, however, for the determination of the validity of the remainders here in question. Her status might be relevant to the problem of distribution of the estate and on this point is discussed below.

children: Mary Hazen Duffey [now Cramer], born November 12, 1897, and Hugh Clarence Duffey, born July[3] 11, 1899. After the testator's death, Hannah gave birth to two more children: Depue Hazen Duffey, born October 9, 1903, and Horace Duffey, born July 8, 1908.

The will provided for the payment of debts and certain specific bequests and then provided that the residue of the estate be put in trust for the benefit of testator's wife for life. At her death, one-half of the corpus was to be, and has been, given to testator's sister and brothers;[4] the other half, composed of realty, remained in trust for Hannah for life. At Hannah's death, the income was to go to the children of Hannah "then living or the issue of such of them as may then be dead leaving issue surviving" Hannah, and then "upon the death of each the share of the one so dying shall go absolutely to the persons who shall then be her or his heirs at law according to the laws of descent now in force in the said District of Columbia".[5]

Testator's widow died on October 31, 1916; Hannah died on May 21, 1915.

On October 5, 1917, the heirs of the testator brought an action in equity to have the provisions of the seventh paragraph of the will stricken as being in violation of the rule against perpetuities. The Supreme Court of the District of Columbia held that the interests of Hannah's children under the will were valid and the Court of Appeals affirmed. Hazen v. American Security & Trust Co., 1920, 49 App.D.C. 297, 265 F. 447.[6] The

---

3. Not June, as appears in some of the pleadings and the Court of Appeals' report (Hazen v. American Security & Trust Co., 49 App.D.C. 297, at page 299, 265 F. 447, at page 449). But this one month's difference has no effect whatsoever on the legal issue here involved.

4. The testator left no mother or father surviving him, and he had no natural children. See files and records in Equity Action No. 52600 for July 22, 1935 (findings of fact by Luhring, J.).

5. The seventh paragraph of testator's will reads:

"Seventh. Upon the death of my said wife, the said Company, hereinafter designated as 'my Executor', shall, after the appraisal mentioned in the next preceding item of this will shall have been made, submit the same to my said adopted daughter, who may select one-half in value of the parts or parcels composing said real and personal estate belonging to my estate and remaining at my wife's death, and thereupon said Company shall hold said one-half of said estate and the parcels of land included in the same for the use and benefit of my said adopted daughter during her life, and shall pay to her, and not to any creditor or assign of hers, the net income from said half in monthly or quarterly instalments as such income is received, it being understood that all proper cost, taxes, cost of insurance and repairs shall be first deducted from the gross income collected, and my said adopted daughter may, if she so elect, occupy free of charge or rent any house composing said half of said estate, and upon her death, the said half shall be held for the use and benefit of the children of said adopted daughter then living or the issue of such of them as may then be dead leaving issue surviving my said adopted daughter, but it is my will and I do direct that Mary Hazen Duffey, the daughter of my adopted daughter and the namesake of my wife and for whom my wife and I have the greatest affection, shall if living at the death of her mother take a share three times as large as the share of each of the other children of my said adopted daughter, which other children shall take in equal shares between and among themselves, and each of the children of said adopted daughter shall take only for and during the terms of their respective lives and upon the death of each the share of the one so dying shall go absolutely to the persons who shall then be her or his heirs at law according to the laws of descent now in force in the said District of Columbia."

Mary took a three-sixth's share; each of the other three children took a one-sixth share.

6. "The devise of the children of Hannah E. Duffey was a devise to a class, which, of necessity, was made up within her lifetime, and the share of each became

validity of the remainders over, after the death of each child, was expressly not ruled upon as the life estates were not "so intimately connected with the gift over as to require us now to determine the validity of such gifts." [7]

Hugh, one of the four life tenants after the death of the widow and Hannah, died on December 19, 1928 and shortly thereafter the trustee brought a bill for instructions; this time the validity of the remainder over to Hugh's heirs was in issue. On January 2, 1930, Judge Bailey ruled that "the remainder provided by the will after his [Hugh's] death to the persons who shall then be his heirs at law became vested within the period prescribed by law and is valid." [8]

On December 13, 1954, Depue died and for the fourth time a suit concerning this trust was started in this court. The trustees desired instructions as to the disposition of Depue's one-sixth share. While this action was pending, on December 18, 1957, Horace died. A supplemental bill was then filed, asking for instructions as to the disposition of this one-sixth share as well. The remainder over after the death of the sole living life tenant, Mary, cannot yet take effect; however, due to the request of all the parties concerned, and in order to save both the time of this court and the needless expense it would otherwise cost the estate, the Court will also pass on the validity of this remainder.

■ The law that governs the questions here involved is the law in effect at the time of the testator's death: December 4, 1901. [9]

■ The common-law rule against perpetuities, as stated by Professor Gray, is as follows:

"No interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest." [10]

---

fixed and certain at her death, and in no way [was?] affected by the provision as to the remainder." 49 App.D.C. at page 300, 265 F. at page 450.

7. Note 6, id.

8. Files and records in Equity Action No. 45943. On July 22, 1935, Judge Luhring decreed that the remainder over at Hugh's death "became vested in Mary Elizabeth Duffey [Hugh's daughter] within the period of a life in being at the time of the death of Abraham D. Hazen and is valid." Files and records in Equity Action No. 52600.

9. Thus the Act of Congress of March 3, 1901, 31 Stat., ch. 854, pp. 1189–1436, which set forth the District of Columbia Code, is not applicable, as such, since the chapter's effective date is January 2, 1902. 31 Stat. 1189. While there is some authority for the use of the law at the time of the execution of the will, especially when the inquiry is the testator's intention, it seems well-settled that the law in effect after death may not be used; in other words, in the absence of express instructions in the will, the law in effect at the testator's death is the very latest that can apply. Generally, see 57 Am.Jur. §§ 1021, 1022, citing cases; Annotation 129 A.L.R. 859 (1940).

10. Gray, "The Rule Against Perpetuities" § 201 (4th Ed. 1942). The statute which would apply to this case, if any, is the Maryland Act of 1789, ch. 101, subch. 1, sec. 2:

"No will, testament or codicil, shall be effectual to create any interest or perpetuity, or make any limitation, or appoint any uses, not now permitted by the constitution or laws of the state [Maryland]."

Also found in The Compiled Statutes in Force in the District of Columbia (1894), p. 557.

The period of time mentioned in Gray's statement of the rule may be increased by actual periods of gestation, but none are involved here.

It has been suggested that the present District of Columbia statute prohibiting perpetuities, D.C.Code, § 45–102, adopted on January 2, 1902, is merely declaratory of the common-law rule and further that even if it is not construed to be the common-law rule, the statute is not exclusive and the common-law rule is also in effect in the District. Simes and Smith, "The Law of Future Interests" (2d Ed. 1956) § 1427, citing Shoemaker v. Newman, 1933, 62 App.D.C. 120, 65 F.2d 208, 89 A.L.R. 1034; Leach, "Perpetuities in a Nutshell", 51 Harv.L.R. 638, 639 (1938). The Court notes that

The effect of the rule is to invalidate *ab initio* certain future interests that might otherwise remain in existence for a period of time considered inimicable to society's interest in having reasonable limits to dead-hand control and in facilitating the marketability of property. The policy of the law is to permit a person to control the devolution of his property but only for a human lifetime plus twenty-one years and actual periods of gestation. With careful planning, this period could be as long as one hundred years—and this is long enough.

█ A gift to a class is a gift of an aggregate amount of property to persons who are collectively described and whose individual share will depend upon the number of persons ultimately constituting the class. Evans v. Ockershausen, 1938, 69 App.D.C. 285, 292, 100 F. 2d 695, 702, 128 A.L.R. 177. The members of the class must be finally determined within a life or lives in being plus twenty-one years and actual periods of gestation, or the gift will fail. Put another way, the class must close within the period of the rule against perpetuities, if the class gift is to be valid. Unless a contrary intent is indicated by the testator, the class will close when any member of the class is entitled to immediate possession and enjoyment of his share of the class gift. Applying these basic principles to the trust here involved, it is seen that the life estates to Hannah's children had to vest, if at all, at the termination of the preceding life

estates of the widow and Hannah. Since Hannah's children had to be born within Hannah's lifetime, and since Hannah was a life in being, the class (Hannah's children) physiologically had to close within the period of the rule.[11] This has already been so held. Hazen v. American Security & Trust Co., supra, at note 6. Furthermore, the remainder over at Hugh's death has been held valid. The Court now holds that the remainder limited to the heirs of Mary is valid. Both Hugh and Mary were lives in being at the testator's death; the remainders limited to their heirs had to vest, if at all, within the period of the rule. Horace and Depue were born after the testator died; the remainders over at their deaths are invalid.

█ In applying the rule against perpetuities, it does not help to show that the rule might be complied with or that, the way things turned out, it actually was complied with.[12] After the testator's death, Hannah might have had more children; one of these might have lived more than twenty-one years after the death of all the lives in being at the testator's death. The vesting of the remainder in this after-born's heirs would take place after the expiration of lives in being and twenty-one years, since the heirs could not be ascertained until the after-born's death and an interest cannot be vested until the interest holder is ascertained. Consequently, because of the possibility that this could happen,

the Court of Appeals in 1920 discussed the common-law rule only, in this case, see Hazen v. American Security & Trust Co., supra. Furthermore, even if the statute applied, the same result would appear to follow.

11. The fact that the will provided "the said half shall be held for the use and benefit of the children of said adopted daughter *then living* or the issue of such of them as may then be dead leaving issue surviving my said adopted daughter \* \* \*" (emphasis supplied) does not cast any doubt on the above. If one of Hannah's children predeceased Hannah and also failed to leave issue, the other children would have increased

shares; but still, the class would be determined, i. e., close, within a life in being (Hannah's).

12. A few jurisdictions have adopted a "wait and see" doctrine which has the effect of neutralizing the possible interest-invalidating events and taking into consideration only the actual events. Perhaps this is a desirable change, but the District of Columbia has not adopted this doctrine and to do so this Court is of the opinion a statute would be necessary. See discussion of the doctrine in Simes and Smith, supra, note 10 at § 1230 and for an example of such a statute, see Mass.Acts (1954), c. 641, enacted as chapter 184A of Mass.Gen.Laws.

even though, in fact, it did not,[13] the remainders limited to the heirs of Horace and Depue (both after-borns) are invalid as a violation of the rule against perpetuities.

Counsel have not argued the point of whether the invalidity of the remainders to the heirs of Horace and Depue serves to taint the otherwise valid remainders to the heirs of Mary and Hugh. Of course, the remainder after Hugh's life estate has already been distributed and is not properly in issue. Nevertheless, as shall be demonstrated, it (and the remainder to the heirs of Mary) are not affected by the two invalid remainders, since the four remainders are to subclasses and stand (or fall) separately.

Beginning with Jee v. Audley, 1 Cox Eq.Cas. 324 (1787) and flowering with Leake v. Robinson, 2 Mer. 363, 35 Eng. Rep. 979 (Chancery 1817), there has been the curious anomaly in future interests law that if the interest of any potential member of a class can possibly vest too remotely, the interests of all the members of the class fails. In other words, the rule is that a class gift is inseparable. For example, T creates a trust to pay the income to A for life and then to pay the corpus over to such of A's children as attain the age of twenty-five. When A dies he might have a child who is not yet four years of age and who was not in being at T's death; this child would not take a vested interest until he satisfied the contingency of reaching the age of twenty-five; since a child under four could not become twenty-five within twenty-one years, the child's interest is void by virtue of the rule against perpetuities. While this much may be sound,

the rule in Leake v. Robinson goes on to invalidate the *entire* class gift. That is, even if the child under four has two brothers who are over twenty-five when A dies, these two brothers take nothing because the invalid interest of their little brother (who, remember, may only be imagined) is contagious—so says Leake. Unless the testator intended to have *all* of the twenty-five-year-old sons take, or none at all (and this is difficult to imagine in the absence of an express provision in the will), the rule is a dubious one. Fortunately, the Court need not apply it in this case because of the limitation put on it by a long line of cases beginning with Catlin v. Brown, 11 Hare 372, 68 Eng.Rep. 1318 (Chancery, 1853).

In Catlin, the devise was of mortgaged property to A for life, then to the children of A in equal shares during their lives, and after the death of any such child, his share to his children and their heirs. Some of A's children were in being at the time that the testator died; some were born after his death. Counsel conceded that the remainders over to the heirs of those children of A born after the testator's death were invalid. The question was whether those concededly invalid remainders tainted the otherwise valid remainders and rendered them invalid. The Court held that they did not; the remainders to the heirs of the children in being at the testator's death were valid. Leake was distinguished on the ground that it concerned remainders to *one* class (A's children that reach twenty-five) while the remainders involved in Catlin were to a group of subclasses (the heirs of each of A's children was a subclass).[14] In other words,

---

13. Mary, a life in being at testator's death, is still alive. Therefore, the heirs of Horace and Depue would *actually* be taking within the period of the rule, but in this area of imagination-run-wild, actualities do not count; what could happen is all that matters.

In this case, the above suppositions are not unreasonable since Hannah was in her middle thirties when the testator died. But cf. the cases of "the fertile octogenarian", "the unborn widow" and

"the magic gravel pit" in Professor Leach's classic article, "Perpetuities in a Nutshell", 51 Harv.L.R. 638, 642–645 (1938).

14. In passing, the Court notes that Sir William Wood in Catlin attempted to distinguish the case of Greenwood v. Roberts, 15 Beav. 92. In that case, the disposition was to A for life, and on his death to such of A's children as might then be living for their respective lives, and on the death of any of them, that child's

the limitation placed on Leake by Catlin is that if the ultimate takers are not described as a single class but rather as a group of subclasses, and if the share to which each separate subclass is entitled will finally be determined within the period of the rule, the gifts to the different subclasses are separable for the purpose of the rule.

█ In the instant case, the language of the will compels the Court to read it as a devise of remainders to subclasses and within the rule of Catlin. The provision in issue reads, in part:

"* * * and *each* of the children of said adopted daughter shall take only for and during the terms of their *respective* lives and upon the death of *each* the share of the *one* so dying shall go absolutely to

the persons who shall then be *her or his* heirs at law * * *" (Emphasis supplied).

The Court deems it advisable to mention that it thoroughly explored the possible applicability here of the Rule in Shelley's Case. Prior to January 2, 1902, this ancient principle of law [15] was in force in the District of Columbia.[16] Noyes v. Parker, 1937, 68 App.D.C. 13, 92 F.2d 562. If it could be utilized in the case at hand, the remainders limited to the heirs of each of Hannah's children would be converted into a remainder in the child himself. This, for one thing, would save the two remainders found invalid and prevent their defaulting to the heirs of the testator.

Assuming, without deciding, that the remainders here are equitable (because

share to be divided among his children when they become twenty-one; and if any of A's children should at A's death be dead and have left issue, such issue to take the share that the deceased parent would have been entitled to had he outlived A. The Court in Greenwood held the gift to A's grandchildren a gift to a class and invalid since A might have a child born after the death of the testator and thus that child's children might not take within the period of the rule. Sir Wood's attempt to distinguish Greenwood is questionable. See Gray, op. cit., note 10 at § 391. In any event, Catlin must be followed here, not Greenwood. The Court of Appeals has held that the interests of Hannah's children is separable from the interests of Hannah's children's heirs, Hazen v. American Security & Trust Co.; there is nothing to lead the Court to believe that the testator had a contrary intention with regard to the separability of the subclasses within the class of heirs of Hannah's children. Cf. Landram v. Jordan, 1905, 25 App.D.C. 291, separability point affirmed on appeal in opinion by Holmes, J., 1906, 203 U.S. 56, at page 63, 27 S.Ct. 17, at page 19, "The trust is not a metaphysical entity or a Prince Rupert's drop which flies to pieces if broken in any part". And see Smith's Estate v. Commissioner of Internal Revenue, 3 Cir., 1944, 140 F. 2d 759 (applying Pennsylvania law); Bowerman v. Taylor, 1915, 126 Md. 203, 94 A. 652; Turner v. Safe Deposit & Trust Co., 1925, 148 Md. 371, 129 A. 294. And see example No. 26 in Leach, supra, note ‾0 at p. 650.

15. It has less generously been described as "the Don Quixote of the law, which, like the last knight errant of chivalry, has long survived every cause that gave it birth, and now wanders aimlessly through the reports, still vigorous, but equally useless and dangerous." Stamper v. Stamper, 1897, 121 N.C. 251, 254, 28 S.E. 20, 22.

16. The Act of March 3, 1901 abolished the rule. 31 Stat. 1352; presently, D.C. Code, § 45–203. For two pre-1902 cases discussing the rule, see Sims v. Georgetown College, 1893, 1 App.D.C. 72; Dengel v. Brown, 1893, 1 App.D.C. 423.

The Court in Sims set forth the rule, as follows: "where, in the same instrument, the ancestor takes an estate of freehold, with remainder mediately or immediately to his heirs, or heirs of his body, the word *heirs* is a word of limitation of the estate, and not of purchase; or, in other words, that such remainder vests in the ancestor himself; and the heirs, when they take, take by descent from him, and not as purchasers from the grantor or devisor. Thus, if the limitation be to his heirs in general, a fee simple is given to the ancestor; * * * the rule is equally applicable to the limitations of equitable as to legal estate; but the estate of the ancestor and the limitation to the heirs, must be of the same quality, that is, both must be legal or both equitable. * * *" 1 App.D.C. at page 79.

the trust is active), nevertheless the rule does not apply because the remainders were not limited to "heirs" but instead went to "her or his heirs at law according to the laws of descent now in force in the said District of Columbia".[17]

When a remainder in fee after a life estate fails, there is no enlargement or diminution of the life estate; rather there is then a reversion in the heirs of the testator. Hilton v. Kinsey, 1950, 88 U.S.App.D.C. 14, 17, 185 F.2d 885, 888, 22 A.L.R.2d 830; Simes and Smith, supra, at note 10 § 1263, and numerous cases cited. The two one-sixth shares held invalid shall pass to the successors in interest to the heirs of Abraham D. Hazen.

Since it is undisputed that the late George E. Sullivan, an attorney, had a contingent fee contract, dated March 16, 1922, with the heirs of the testator, entitling him to twenty percent of whatever property was finally held to pass to the heirs of the testator by virtue of the failure of the remainders, and since this has now been brought to fruition, the estate of Edith B. Sullivan, the sole heir of George E. Sullivan, is entitled to a twenty percent share of the two one-sixth interests.

Counsel have stipulated that Hannah was referred to in testator's will as his "adopted daughter"; there is no agreement as to whether she actually was legally adopted. No proof of a legal adoption has been offered. On the other hand, there is considerable reason to say that Hannah never was, in fact, legally adopted. In 1927 a full hearing was held on the matter and at that time Hannah's husband, mother and numerous friends were alive and testified; these persons have since passed away and the Court is of the opinion that nothing could be gained by ordering a further hearing at this time.

It is clear from the transcript of the hearing that Hannah was treated by the testator and his wife just as if she were their natural daughter. She lived with them, was always referred to as "our daughter", and used their name. Her formal wedding invitation referred to her as the Hazens' daughter; the community believed she was the Hazens' natural daughter. While there is little testimony on the question of whether she was ever legally adopted, what there is, leads to the conclusion that she had not been.[18] Moreover, it would appear that it was impossible for her ever to have been legally adopted since the original adoption statute provided for the adoption of "minor children" only. 28 Stat. 687, ch. 134 (passed February 26,

---

17. "[Shelley's rule] does not apply if * * * the heirs are to be ascertained as of some time other than the death of the ancestor. [Citing cases.] Cases of that sort would be where the remainder is to the heirs of A according to the statutes in force at the time of the making of the will * * *." Simes and Smith, supra, note 10, at § 1547. And see 4 Thompson on Real Property § 2249 (Perm.Ed.1940); 3 Restatement, Property § 312, Comment g (1940); 1 American Law of Property § 4.43 (1952).

18. Transcript of hearing in Equity Action No. 45943: Hugh Clarence Duffey (Hannah's husband) testified:
"Q. Who was she with reference to the late Abraham D. Hazen? A. She went as his adopted daughter, but she was adopted later on, I think. I am not clear as to that. I could not tell as to that. That was before my time." (Tr. p. 2.)
"Hannah E. Langley, a witness on behalf of the plaintiffs, testified in subtance as follows: That she is a sister of the late Mary V. Hazen, the wife of General Hazen; that the girl Hannah who lived with General Hazen and his wife, and later married Dr. Duffey, was witness' daughter; General Hazen took Hannah to live with him when she was about three years old, he was so fond of her; that Mr. Langley, Hannah's father, lived at the time and was perfectly willing that they should have her; that General Hazen wanted to adopt her but kept putting it off and it was never done." (Tr. p. 41.)

1895).[19] Hannah was at least twenty-six years of age in 1895.[20]

■ One matter remains. The Court has been urged to terminate the trust and order distribution of three-sixths of the original corpus to the life tenant, Mary. This life tenant is presently sixty-two years of age; she is a widow and has three adult children. These three children and their wives have signed an "assignment" of their interests in the trust to Mary. Although the legal significance of this "assignment", standing alone, is questionable, in light of the fact that the children are not their mother's heirs but only presumptive heirs until she dies, nevertheless, it is significant to show that the only persons likely to become remaindermen are willing to have the income beneficiary take the corpus. The intent of the testator is clear:

> " * * * I do direct that Mary Hazen Duffey, the daughter of my adopted daughter and the namesake of my wife and for whom my wife and I have the greatest affection, shall if living at the death of her mother take a share three times as large as the share of each of the other children of my said adopted daughter * * *."

It seems obvious that the testator had Mary's interest uppermost in his mind. Last year, Mary's share of the income from the trust amounted to $750.51 which was hardly sufficient for her subsistence; her needs would be amply provided for were she to receive the share of the corpus. If General Hazen were now alive, there would seem to be little doubt but that he would wish to join with Mary's children to have the trust terminated and the corpus distributed to the one for whom he had "the greatest affection" and who was to receive "a share three times as large as the share of each of the other children". In light of the realities of the situation, the desire of all concerned to have the trust terminated, and the evident purpose of the will, the Court shall order the trust terminated and the corpus distributed to the life tenant. Cf. Wolcott's Petition, 1948, 95 N.H. 23, 56 A.2d 641, 1 A.L.R.2d 1323. This, however, is conditioned upon the furnishing of a bond to protect any unascertained remaindermen.

Defendant Blakelock's motion for summary judgment is granted. Defendant Mary Duffey Cramer's prayer for additional relief is granted to the extent of having her receive that portion of the corpus presently supplying the income to which she is entitled as a life tenant, conditioned on her furnishing a bond or undertaking with surety approved by the court.

Counsel will submit an appropriate order.

---

19. The statute can also be read in D.C. Code (1951 Ed.), at p. 507, "Compiler's Note" to § 16–207. This statute was carried over verbatim in the Act of March 3, 1901 (see 31 Stat. 1252, ch. 854, § 395) and was not changed until the Act of August 25, 1937, which change occurred after Hannah's death.

20. Her natural mother testified that "Hannah went with the General [Hazen]" "in 1868 or '69". Tr. p. 42. At p. 43, Han-

nah's mother testified that "Hannah was with General Hazen ever since she was three years old." This would mean that Hannah was at least twenty-nine years of age in 1895.