445 F.2d 201
 The RIGGS NATIONAL BANK OF WASHINGTON, D. C.
Trustee Under the Will of Henrietta V. Johnston, Deceased,
v.
John V. SUMMERLIN, Jr., Harriott Summerlin Humphrey, Appellants,
Dolores Summerlin Kelchner et al., Harriott Page Humphrey, Peter Gage Humphrey, Walcott Juliess Humphrey, IV, Appellants,
The Washington Foundation, etc.
 No. 23437.
 United States Court of Appeals, District of Columbia Circuit.
 Argued April 21, 1970.
 Decided February 26, 1971.
 As Amended March 4 and March 19, 1971.
 Petition for Rehearing Denied April 12, 1971.
 Certiorari Denied October 12, 1971.
 
 See 92 S.Ct. 91.
 Mr. Alfred L. Scanlan, Washington, D. C., with whom Mr. Frederick C. LeComte, Washington, D. C., was on the brief, for appellants.
 Mr. Wilford E. Neier, Port Washington, N. Y., of the Bar of the Court of Appeals of New York, pro hac vice by special leave of Court, and Mr. Brainard H. Warner, III, Washington, D. C., for appellees, Dolores Summerlin Kelchner and Elna Barrett Summerlin.
 Messrs. James E. Murray and Frederick M. Bradley, Washington, D. C., entered appearances for appellee, Riggs Nat. Bank of Washington, D. C.
 Before ROBINSON, MacKINNON, and WILKEY, Circuit Judges.
 WILKEY, Circuit Judge.
 
 
 1
 This appeal is taken from summary judgment of the District Court that appellee, Dolores Summerlin Kelchner, an adopted child, is entitled as a matter of law to take under a trust created in the will of her adoptive father's grandmother, as "issue" of the father. Appellants are the two natural children of the adopting father. The Bank as Trustee is a stakeholder.
 
 I. The Will
 
 2
 On 22 March 1929 Henrietta Johnston executed a will containing the following paragraph:
 
 
 3
 Seventh. All the rest, residue and remainder of my estate of every kind and description, real and personal, wheresoever and howsoever situated, now possessed or that may hereafter be acquired by me, including any lapsed legacy, bequest or devise hereinbefore made or given, I give, devise and bequeath, absolutely and in fee simple, unto the said The Washington Loan and Trust Company, in and upon the trusts, nevertheless that is to say:
 
 
 4
 In Trust, to take charge of, manage, control, invest and reinvest the same, * * * and the net income therefrom to pay in monthly or quarterly installments, as follows:
 
 
 5
 * * * * * *
 
 
 6
 (d) One-fourth (¼) thereof unto my said grandson, JOHN VANDERGRIFT SUMMERLIN, for and during the term of his natural life, and upon his death, to pay such portion of such net income and any other share of the net income from such trust fund to which he would have been entitled if living, among his ISSUE, per stirpes and not per capita, unless he should be survived by a widow, in which event she shall be entitled, during the term of her natural life, to one-third (1/3) of such portion of such net income and any other share of the net income from such trust fund to which my said grandson would have been entitled if living, unless she should remarry, in which event until the date of such remarriage; subject, however, to the further condition that should my said grandson die without issue him surviving, to distribute such share of the net income from my said trust fund to which he would have been entitled if living, equally among my said husband, JOHN A. JOHNSTON, should he be then living, my said daughter VIRGINIA L. SPENCER, should she be then living, and my said grandson, GEORGE THOMAS SUMMERLIN, JR., should he be then living, and in the event that the said GEORGE THOMAS SUMMERLIN, JR. be then dead, unto his issue, such issue to be entitled thereto, per stirpes and not per capita, subject, however, to the share of the income of his widow; and
 
 
 7
 IN FURTHER TRUST, upon the death of the survivor of my said husband, JOHN A. JOHNSTON, my said daughter, VIRGINIA L. SPENCER, my said grandson, GEORGE THOMAS SUMMERLIN, JR., and my said grandson, JOHN VANDERGRIFT SUMMERLIN, and any of the ISSUE of my said grandsons living at the time of my death, the corpus of said trust fund shall be distributed per stirpes and not per capita, absolutely and in fee simple, among the issue of my said grandsons; * * *. (Emphasis added.)
 
 
 8
 Mrs. Johnston died on 28 March 1930, leaving her will, with the above provisions setting up a testamentary residuary trust, in full force and effect.
 
 
 9
 Trust provisions (a) through (d) described the manner of distribution of the trust benefits to four different beneficiaries, all of whom were of the blood line of the testatrix, and the last provision marked the duration of the trust. Since the present controversy revolves around the meaning of the portion of provision (d) directing the distribution of John Vandergrift Summerlin's share to his "issue" upon his death, that provision has been reproduced "in toto" above, as has been the last provision for reasons apparent later in this opinion.
 
 II. Background to this Appeal
 
 10
 John Vandergrift Summerlin, grandson of the testatrix, fathered two children by his first marriage, John V. Summerlin, Jr., and Harriott Summerlin Humphrey, appellants herein. This marriage ended in divorce, and in 1941 after a second unsuccessful marriage, he wedded one Elna Barrett, who had a child, Dolores, appellee herein, by a previous marriage. In 1942, when Dolores was 7 years old, John Vandergrift Summerlin formally adopted her. Nine months later he died.
 
 
 11
 In 1943 the trustee, under the above paragraph of Mrs. Johnston's will, began to pay 1/3 of the income from the deceased's share of the residuary trust to his widow, Elna Barrett Summerlin, and split the remaining 2/3 between John V. Summerlin, Jr., and Harriott Summerlin Humphrey as Summerlin's "issue." However, in 1969 the trustee filed suit in the District Court for construction of the will, feeling the recent decision of this court in Johns v. Cobb[1] made such action necessary. In pressing her claim to be his "issue" within the terms of the will setting up the trust, Dolores also sought to share in the eventual distribution of the corpus upon termination of the trust.
 
 
 12
 According to the last provision of the Seventh paragraph, the latter event will now occur upon the death of the survivor of the "issue" living at the time of the testatrix's death, i. e., the "issue" of either John Vandergrift Summerlin or Mrs. Johnston's other grandson, George Thomas Summerlin, Jr., since the two grandsons, her husband, and her daughter have all died. It is uncontested on appeal that the "issue" who were alive at Mrs. Johnston's death are Virginia Summerlin Wilcox, the surviving daughter of the other grandson, and Harriott Summerlin Humphrey, who was "en ventre sa mere" when the testatrix died. Both are natural children of the grandsons. At the time of Mrs. Johnston's death neither grandson had adopted any children.
 
 
 13
 In its decision the District Court found that there was nothing within the four corners of the Johnston will that pointed to a preference on the part of the testatrix regarding adopted children, and relying on our recent decision in Johns v. Cobb in regard to such situations, concluded that "public policy" required that Dolores be considered to be "issue" within the terms of the will.
 
 
 14
 On appeal, both sides have argued extensively on the applicability of the Johns rationale to the case at bar. Since, in our view, the language of the will, read in light of the surrounding circumstances, establishes that the testatrix's use of the word "issue" was not intended to include children adopted by the grandsons, we do not find it necessary as a last resort to look at "public policy" to determine the testatrix's intent, as we did in Johns.
 
 III. Interpretation of the Will
 
 15
 A. Legal Meaning of "Issue" Previously Established
 
 
 16
 In searching for the intent of the testatrix in using the word "issue" to define the beneficiaries of the trust, since this will was drawn up by the principal trust officer of the Washington Loan and Trust Company, a competent draftsman undoubtedly familiar with the estate law of the District of Columbia, logically we should turn first to the established legal meaning, if any, of the word "issue" at the time of the will's execution in March 1929.
 
 
 17
 The draftsman had before him only one precedent in this circuit, Allen v. Reed,[2] decided in 1927. There the question was whether the word "issue" in the particular context of that will included grandchildren as well as children. No adopted child was involved, as here. In considering the word "issue" in the particular circumstance and language of the will involved, this court stated:
 
 
 18
 The words "issue," or "lawful issue," when used in a will, are prima facie to be interpreted in their ordinary sense as embracing all future descendants, and are to be construed as words of limitation of the inheritance equivalent to the technical expression "heirs of the body." 28 R.C.L. 257.
 
 
 19
 In its legal sense, as used in statutes, wills, deeds, and other instruments, "issue" means descendant; lineal descendant; offspring. 33 C.J. 818.
 
 
 20
 Although the precedents construing "issue" were scarce in this jurisdiction, they abounded in others. Three years after the testatrix in the case at bar died, this court in deciding Shoemaker v. Newman[3] cited precedents from Iowa, New York, Ohio, Kentucky, Vermont, Tennessee, and Illinois as authority for stating:
 
 
 21
 We come now to consider the rights, if any, of * * * the adopted son, * * * to whom Abner in his will attempted to convey his interest derived from the estate of his grandfather. It is settled law, we think, that an adopted child inherits only from his adopted parents, and does not inherit through the foster parents, from direct or collateral kin. * * * In the Baxter Case the court specifically held that an adopted child could not inherit through her adopted father his interest in his father's estate. This rule, I think, is without exception.[4] (Emphasis supplied.)
 
 
 22
 At another point in construing the will, this court said:
 
 
 23
 When Abner died without issue, his interest in the undistributed share of the estate followed the same course as would the share of a child of a testator dying without issue. It lapsed into the residue of the estate.[5] (Emphasis supplied.) This court thus spoke of Abner dying without issue, even though he had an adopted son to whom he attempted to will his share of his grandfather's estate.
 
 
 24
 These two precedents, one shortly before and the other shortly after the drafting of the will and the death of the testatrix, thus reflecting the state of law at that time, are persuasive in support of appellants' position that "issue" only included direct lineal blood descendants and thus did not include adopted children. However, the paucity of precedents and the lack of a direct holding on the question here involved inveighs against relying upon any technical meaning attributable to the term "issue" as decisive. Indeed, this court very recently in Johns v. Cobb rejected an argument "that the controversy can be resolved merely by looking at the word `issue', which in their view has an established legal meaning that excludes adopted children. * * * Our cases have seldom discussed the term in relation to adoption, * * *."[6]
 
 
 25
 Here we are not required to reach the same result as Johns v. Cobb, because in that case we found nothing within the four corners of the will to assist in determining the testators' intent, nor any help from any of the extrinsic evidence in the record. In neither case do we rely on the legal meaning of the word "issue" in this jurisdiction as being sufficiently established to be determinative.
 
 
 26
 Here we have far more guidance than we did in Johns v. Cobb. We find the evidence of the testatrix's intent within the four corners of the document, as illuminated by the circumstances, including the laws in effect at the time of the execution of the will and death of the testatrix. Even though there is no established legal meaning of "issue," we can examine the way in which the word was used in the will itself for evidence of the testatrix's actual intent. And in the absence of evidence in the record pointing to the contrary, we give the word the interpretation which lends to the provisions in which it appears their most reasonable and natural construction.[7]
 
 B. Measuring the Duration of the Trust
 
 27
 In the final trust provision, the duration of the trust was marked by the life spans of the testatrix's husband, daughter, grandsons, and the issue of the latter living at the time of her death. If the word "issue" is interpreted in this context as including adopted children, we are led to the conclusion that Mrs. Johnston intended that the duration of the trust might possibly be measured by the life span of any person living at the time of her death whom her grandsons saw fit to adopt, even after her death. This would be to say that she intended to invite mischief, since by merely adopting persons who were actually living at the time the testatrix died but were strangers to her, each grandson could create new measuring lives for the trust at his option. Hence, the ultimate gauge measuring the duration of the trust would be unidentifiable until the deaths of the grandsons.
 
 
 28
 Where a testatrix uses such language, defining a class by which the testamentary trust duration is to be measured, it appears logical that the measuring class should not only be defined but knowable at the specified chosen critical time, i. e., "at the time of my death." The time of death of the grandsons is nowhere in the document made of any importance. The interpretation of "issue" urged by appellee here would make both the duration of the trust and the number and identity of the trust beneficiaries turn upon the date of death of the last grandson. Appellants' interpretation of "issue" accords it a more natural meaning which can be consistently applied throughout the will, i. e., the meaning given "issue" by this court in Allen v. Reed,[8] two years before the will here was drafted.
 
 
 29
 The appellee here was adopted by her foster father twelve years after the death of the testatrix. Neither grandson had adopted any children at the time the will was executed or by the time the testatrix died, so at no time did the will actually contemplate using those adopted before Mrs. Johnston's death for purposes of measuring the duration of the trust. And, as pointed out above, it would be stretching the bounds of reasonableness to conclude that the testatrix contemplated using those adopted after her death as potential measuring lives for her testamentary trust.[9] Therefore, the only conclusion that can be reached is that in using the word "issue," Mrs. Johnston was referring to children naturally born of her grandsons. Only then could the class of measuring lives for the trust be closed at the most reasonable point, its inception — her death.
 
 
 30
 The reasonableness of this interpretation is strengthened by the fact that all those specifically named in the will as measuring lives for the trust — the testatrix's husband, daughter, and grandsons — were of the family blood line. To restrict the word "issue" to children born of the blood of the grandsons is thus in harmony with the selective pattern evidenced by the testatrix in the rest of the provision.[10]
 
 
 31
 Of course, the provision marking the duration of the trust is not the dispositive provision directly in question here. Nevertheless, it is important to the interpretation of the latter because of its use of the crucial word to this contest, "issue," and because it is part of the same paragraph of the will. As a general rule, if two sections of a will can be read together reasonably, they must be so read.[11] Particularly when a will is written by a skilled draftsman, it cannot normally be supposed that the same word means different things in separate portions of the instrument.[12] We think this is especially true when the two portions of the will are found next to each other in the same paragraph, as is the case here.
 
 
 32
 It would thus be unreasonable to conclude that when the will used the word "issue" to mark the duration of the trust, it meant one thing, and when the will used the word "issue" to identify the beneficiaries of the trust, it meant another. We conclude that the word means the same thing in both contexts — children naturally born of the grandsons.
 
 C. Adoption After the Testatrix's Death
 
 33
 One significant differentiation in interpreting the testator's intent, which is marked in numerous cases, is whether the adoption occurred before or after the testator's death. That, incidentally, is also a significant differentiation between this case and Johns v. Cobb, supra. There the child was adopted four years before the death of one testatrix and twenty-two years before the death of the other. In Johns v. Cobb both testatrices had an opportunity to know the adopted child, one very well indeed, before the testatrix died. In the case at bar the appellant was adopted twelve years after the testatrix's death in 1930.
 
 
 34
 The state of the law at the time of the testatrix's death is reflected in a comment published in 1931:
 
 
 35
 The fact that the adoption was subsequent to the testator's death raises a grave presumption against an intention to include such adopted child, and the better rule seems to be that the fact that the testator had no knowledge of the adoption at his death overcomes the presumption that his intention was so to draw his will as to harmonize with the adoption laws.[13]
 
 
 36
 A more recent survey by the same source concluded that in the "great majority of cases involving the right of children adopted by a designated person after the death of a testator," the terms "issue" or "child" have been held not to include an adopted child.[14] The result of another survey concludes:
 
 
 37
 With respect to the adopted children of persons other than the person executing the will, trust instrument or conveyance, the cases exhibit a tendency to exclude from the scope of the term in question children adopted after the testator's death and to include those who were adopted to the knowledge of the testator, although the latter circumstances are far from conclusive.[15]
 
 
 38
 Thus our conclusion here excluding the child adopted twelve years after the testatrix's death, and our decision in Johns v. Cobb, including the child adopted before the death of both testatrices, are in accord with the results reached in the preponderance of cases, and not inconsistent one with the other.
 
 D. Cross-Remainders to the Blood Line
 
 39
 Furthermore, within the terms of provision (d) itself, there is evidence that the testatrix intended the word "issue" to mean children naturally born of the grandsons. In this, and indeed in each dispositive provision of the paragraph setting up the trust, the testatrix used cross-remainders to maintain the trust benefits in the blood line should one of the beneficiaries, all of whom were in the blood line, die without issue. In other words, the benefits of the trust accruing to a beneficiary deceased without issue would not pass to others outside the blood line through his estate, but would be distributed to the remaining beneficiaries named in the testatrix's will.
 
 
 40
 The only persons not in the blood line who stood to share in the trust were the wives of the grandsons, should they outlive their husbands and not remarry. Even then, their portions amounted to only a life estate in 1/3 of the income which their husbands would have received had they lived. Moreover, the wives could not partake in the division of the corpus at the termination of the trust.
 
 
 41
 In our view, these arrangements clearly demonstrate the intent of the testatrix to maintain the benefits of the trust in the blood line, and, when combined with the way in which the word "issue" was used to mark the duration of the trust, convince us that the testatrix intended to restrict the meaning of the latter to include only children naturally born of the grandsons.
 
 
 42
 E. The Inheritance Statutes — "From" but Not "Through"
 
 
 43
 Although we are not dealing here with the question of the right of an adopted child to inherit by intestate succession from an ancestor or other relative of the parent, the District of Columbia statutes regulating the right of an adopted child to inherit from and/or through her adopted parents are obviously relevant in ascertaining the intention of the testatrix as to whether a possible adopted child was to be included or excluded from the ultimate chain of distribution of the estate. We presume that the expert draftsman here, practicing as he did in this specialized field of trust and estate law, must have been cognizant of the inheritance and adoption statutes in force in 1929 in the District of Columbia.
 
 
 44
 Of equal importance, the draftsman must have known and relied upon the long-established principle in the construction of wills that the law which may be regarded as relevant in ascertaining the intent of the testator is that which was in existence at the time of his death.[16] The "law in effect at the testator's death is the very latest that can apply."[17] Law which becomes effective after the death of a testator is inapplicable in determining or affecting the testator's intent, on the obvious and undeniable logic that the testator cannot be presumed to have acted upon the basis of law not yet in being when he died. In this case, when we seek the testator's intent, we must look at the law in the District of Columbia in 1929 when the will was executed and in 1930 when the testatrix died. To look to a later law can never be justified in searching for intent — to do so would be to rewrite the will — but is only justified when the testator's intent is not ascertainable from any source.
 
 
 45
 The District of Columbia Act of 1895 placed the adopted child on the same footing as a natural child where inheritance from the foster parents was concerned.[18] Yet it did not change the established rule that the adopted child would not, in the absence of a specific direction to the contrary, inherit through the foster parents from a grandparent or other relative under a will.[19]
 
 
 46
 It was this statute which was in effect in 1929 when the will was executed. Although Shoemaker v. Newman was decided three years after the testatrix's death in 1930, yet it is close enough in time to reflect accurately the existing law in the District of Columbia at the time of the testatrix's death, and it was construing the same inheritance statute which was then in effect. As we have noted above, this court in Shoemaker v. Newman stated, "It is settled law, we think, that an adopted child inherits only from his adopted parents, and does not inherit through the foster parents, from direct or collateral kin."[20] It is significant that in Shoemaker the adopted child there involved could have inherited under the will, if he had been considered "issue" by this court.
 
 
 47
 In 1937, four years after Shoemaker v. Newman, Congress enacted amendments to the adoption law construed in that case. The 1937 statute reaffirmed the status of the adopted child as equal to that of the natural child in relation to the parent, but also specifically provided that an "[a]doptee shall not inherit from collateral relatives of or the parent of the adopter * * *."[21] This was the same construction given to the 1895 statute by Shoemaker, now embodied in specific statutory language.
 
 
 48
 It was not until 1954 that District of Columbia law provided that an adopted child would take property as a natural child not only from, but also through, the adopter. It was recognized by the Congress that "the proposed law suggests a distinct change from the present law," but it was believed that the change reflected the current desires of grandparents for a "from and through" law. The House Report stated, "It was therefore the thought of the Committee that the law should be brought into conformity with the desires of the many and the few who objected to it could specifically change their wills to the contrary."[22] Thus the Congress recognized the long-established principle that a testator is presumed to act in the light of the law existing at the time he makes his will or, at the latest, at the time he dies. Therefore, the House Committee gave warning that those who did not like the new law could avoid it by the affirmative act of changing their wills.
 
 
 49
 Implicit in this recognition that those still living could change their wills lies the recognition of the gross unfairness of applying the new law to the wills of those already dead, who had no chance to change their wills. To guard against the new law placing the adopted child in the same status as a natural child for the purpose of taking through his adopting parents, the Congress specifically provided in the statute itself that
 
 
 50
 The provisions of this chapter shall have no retroactive effect except to the extent that they shall specifically provide, and shall not be construed as affecting in any way the rights and relations obtained by any decree of adoption entered prior to June 8, 1954 * * *.[23]
 
 
 51
 Thus, this history of congressional changes in the inheritance and adoption laws of the District of Columbia shows not only that in 1930 (when the testatrix died) an adopted child was not presumed to inherit through the foster parents from grandparents or collateral relatives unless so specifically directed in the will, but also that the Congress in subsequent legislation recognized this principle as previously existing and guarded against changing that principle in the interpretation of any will of a person decedent before the effective date of the change in the law. Therefore, in this case we give effect to the testatrix's intent, illuminated by what the law was known to her draftsman to be in 1929 and in 1930, a process of interpretation which is obviously in accord with the expectancy of Congress and its legislation in 1954.
 
 
 52
 F. Reconciliation of the Congressional Act of 1954 and Johns v. Cobb
 
 
 53
 Our dissenting colleague finds it difficult to square this part of our opinion with our previous decision in Johns v. Cobb, saying: "That conclusion, I submit, departs completely from Johns v. Cobb." If our colleague's interpretation of Johns v. Cobb is correct, then Johns v. Cobb departed completely from the congressional statute. We do not take this position here. Johns v. Cobb did not discuss the history of the adoption statutes as bearing on the intent of the testatrices there. Johns v. Cobb simply found no intent of the testatrices, and as our dissenting colleague correctly says, "It is attributed, rather than interpreted, testatorial intent which public policy is to determine"; it was this current public policy that Johns v. Cobb relied upon to attribute an intent in the wills where none was found i. e., our court on this point simply wrote the will for the testator in the light of current public policy.
 
 
 54
 We have no such problem here. We are interpreting the intent of the testatrix in the light of the statutory and case law as it existed at the time the will was drafted and executed in 1928 and at the time the testatrix died in 1930. And it is definitely not correct to say, as our dissenting colleague argues, that we can "cleave[d] problems of intestate succession by adoptees from interpretive problems under wills possibly favoring adoptees." The Congress of the United States specifically recognized the contrary in 1954 when it changed the District of Columbia law to provide that an adopted child would take property not only from but also through the adopter. Although this was technically an adoption and intestate succession law, the Congress fully recognized the impact it would have on wills; hence the House Reports stated that "the few who objected to it [the new adoption law] could specifically change their wills to the contrary."[24] This recognized that existing wills would be interpreted in accord with the law existing at the time of the testator's death, which is the only way in Anglo-American legal history that wills have been construed. It further recognized that the existing wills could be specifically changed to provide a different dispositive scheme than the intestate succession statute in 1954 provided.[25]
 
 
 55
 Not only do we believe this court here is correct in recognizing the relationship of the existing adoption law to the intent of testators — because Congress obviously recognized that connection when it enacted the legislation — but we also rely upon the congressional mandate that the provisions of the 1954 intestate law changing the rule as to inheritance through as well as from "shall have no retroactive effect" and "shall not be construed as affecting in any way the rights and relations obtained by any decree of adoption entered prior to June 8, 1954. * * *" This mandate against retroactivity in the interpretation of "rights and relations" was not mentioned in Johns v. Cobb and had no application to that case, probably for two reasons: (1) Both the testatrices died years after the child was adopted, hence in the language of the congressional report of 1954, if they "objected to it could specifically change their wills to the contrary." The testatrix in the case at bar had no such opportunity, nor did her scrivener have the opportunity to read Johns v. Cobb. He read Allen v. Reed, supra, and cases then current in other jurisdictions. (2) This court in Johns v. Cobb was not attempting to find the intent of the testatrices; in the complete absence of such discernible intent it was attributing an intent derived from current public policy as reflected in the same adoption statute — which our dissenting colleague says should have no relation to the interpreting of wills.
 
 
 56
 When our dissenting colleague says, "Today's decision marks what in my view is a retrogression to the uncertainties characterizing the era predating Johns v. Cobb," in our opinion he has misjudged where the uncertainty lies. There was no uncertainty prior to Johns v. Cobb. In 1943 the trustee, after paying one-third of the income to the widow of the testatrix's grandson, split the remaining income two-thirds between the two natural children as the grandson's "issue." No one thought that under the will and the existing law the adopted child should share the income as one of the grandson's "issue." It was not until 1969, subsequent to this court's decision in Johns v. Cobb, that confusion, based obviously on a possible interpretation of Johns v. Cobb similar to that of our dissenting colleague here, struck the lawyers for the trustee and an action to construe the will was filed.[26]
 
 
 57
 We have in this opinion, we think, placed the proper interpretation on Johns v. Cobb as a case, as do nearly all will cases, resting on its own facts. These were principally that this court could find no intent whatsoever from the wills on the particular question, and turned as a last resort to the current public policy to determine that in that case the adopted child was included. Not so here, because we have a will in which the intent is evident, a will that was construed from 1943 to 1969 to exclude the adopted child without protest from her.
 
 
 58
 Furthermore, our position here is compatible both with the congressional mandate against giving retroactive effect to the 1954 statute and Johns v. Cobb. The interpretation of our dissenting colleague would ascribe to Johns v. Cobb an overruling sub silentio of the congressional mandate, and a promulgation henceforth of a "canon of interpretation" (really a canon of attribution, as he states elsewhere) which is clearly contrary to what Congress stated in plain and unmistakable language. We do not think this court in Johns v. Cobb promulgated any canon of interpretation overruling — especially without mention of it — the congressional mandate against giving retroactive effect to the new right of a child, adopted after June 8, 1954, to inherit through as well as from his adopter. The statute is still on the books, it is law binding on us, and we follow it here.
 
 IV. Conclusion
 
 59
 Summing up, then, we find that this will shows within its four corners that the testatrix intended by the use of the word "issue" to mean those naturally born of the grandsons only, excluding adopted children. Only through this interpretation of the word can the provision of the will marking the duration of the trust be given its most reasonable construction. The proximity of this provision to the dispositive provisions of the paragraph setting up the trust, along with the fact that the will was drafted by a competent draftsman, show that the word "issue" was intended to mean the same thing in each. Moreover, restriction of "issue" in this manner comports with the overall scheme of the trust, which measures its duration by the lives of those of the testatrix's blood line and likewise restricts its benefits. The strong presumption against including a child adopted subsequent to the death of the testatrix applies to the appellant here, the exact reverse of the fact situation in Johns v. Cobb. We find the meaning of the will further illuminated by a consideration of the inheritance and adoption laws of the District of Columbia in effect in 1929 and 1930, as then interpreted by this court, and by the Congress in subsequent legislation.
 
 
 60
 Summary judgment of the District Court is reversed and the case remanded for entry of a decree consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 131 U.S.App.D.C. 85, 402 F.2d 636 (1968)
 We said at 131 U.S.App.D.C. 86, 402 F.2d 637:
 We find nothing within the four corners of the wills which assists us in ascertaining what the testators intended by the word "issue."
 We then went on to say:
 [I]n such a situation, where the record and the inferences to be drawn therefrom do not suggest what the actual intent of the testator might have been, it is our duty to supply a reasonable intent by implication. Our guide in this undertaking is necessarily public policy, in accordance with which we assume the testators would have wished their wills to be interpreted. 131 U.S.App.D.C., at 87, 402 F.2d, at 638.
 However, where the will itself yields the intent of the testator, we are guided thereby and not by public policy.
 
 
 [2]
 57 App.D.C. 78, 17 F.2d 666 (1927)
 
 
 [3]
 62 App.D.C. 120, 65 F.2d 208, 89 A.L.R. 1034 (1933)
 
 
 [4]
 62 App.D.C., at 126, 65 F.2d, at 214
 
 
 [5]
 62 App.D.C. 120, 65 F.2d, at 212
 
 
 [6]
 131 U.S.App.D.C., at 86, 402 F.2d, at 637 (1968)
 
 
 [7]
 Evans v. Evans, 60 App.D.C. 371, 55 F.2d 533 (1931); Orendorf v. Fayette Farms, 112 F.2d 149 (6th Cir. 1940); 4 Bowles-Parker, Page on Wills 44 (1961). Our dissenting colleague argues that an expert draftsman would never have depended "on an ambiguous word like `issue' to exclude adoptees." Of course, every will coming before a court for construction implies in some measure that the draftsman has failed of his purpose to make the intent of the testator absolutely clear "beyond cavil." Yet any draftsman is faced with the necessity of setting forth the testator's objectives in general terms to apply to innumerable situations which conceivably might arise. The draftsman here used the word "issue" for more than one purpose. It would indeed be regrettable if his confidence in the law as he knew it at the time he drafted the will and in this court's ability to interpret that law were found to be misplaced
 
 
 [8]
 Note 2,supra.
 
 
 [9]
 The appellee was born five years after the testatrix's death, hence is not a measuring life
 
 
 [10]
 As is discussed in detail later in this opinion, the testatrix used cross-remainders in the dispositive provisions of the trust to maintain its benefits substantially within her blood-line
 
 
 [11]
 Grabois v. Grosner, 124 U.S.App.D.C. 247, 363 F.2d 979 (1966). See also Summerlin v. Washington Loan and Trust Company, 88 U.S.App.D.C. 110, 186 F.2d 535 (1955), where we previously construed the same provision of Mrs. Johnston's will, but in a different context
 
 
 [12]
 Nicodemus v. Bain, 120 U.S.App.D.C. 116, 344 F.2d 501, cert. denied, 382 U.S. 891, 86 S.Ct. 183, 15 L.Ed.2d 149 (1965)
 
 
 [13]
 70 A.L.R. 621, 626 (1931)
 
 
 [14]
 86 A.L.R.2d 12, 58 (1962)
 
 
 [15]
 2 Am.Jur.2d 939 (1962)
 
 
 [16]
 In re Gray's Estate, 168 F.Supp. 124, 127 (D.D.C.1958)
 
 
 [17]
 American Security & Trust Co. v. Cramer, 175 F.Supp. 367, 370 (D.D.C. 1959)
 
 
 [18]
 28 Stat. 687 (1895), D.C.Code § 395 (1901)
 
 
 [19]
 Shoemaker v. Newman,supra note 3.
 
 
 [20]
 Note 4,supra.
 
 
 [21]
 16 D.C.Code 205 (1940). The legislative history of this provision isin toto as follows:
 (4) Adoptee shall not inherit from collateral relatives of adopter — The advisability of this provision is obvious. H.Rep.No.1274, 75th Cong., 1st Sess. 2 (1937); S.Rep.No.1034, 75th Cong., 1st Sess. 3 (1937).
 
 
 [22]
 H.Rep.No.1347, 83rd Cong., 2nd Sess. 7 (1954). (Emphasis added.)
 
 
 [23]
 16 D.C.Code 225 (1961), now 16 D.C. Code 315 (1967)
 
 
 [24]
 Note 22,supra.
 
 
 [25]
 16 D.C.Code 312, "Legal Effects of Adoption," now provides:
 The adoptee takes from, through, and as a representative of his adoptive parent or parents in the same manner as a child by birth, and upon the death of an adoptee intestate, his property shall pass and be distributed in the same manner as if the adoptee had been born to the adopting parent or parents in lawful wedlock.
 Carrying out the congressional prohibition against retroactive effect of these provisions, Section 315, "Prior Proceedings," also provides:
 The provisions of this chapter have no effect prior to June 8, 1954, except to the extent that they specifically so provide. They do not affect in any way the rights and relations obtained by any decree of adoption entered prior to June 8, 1954.
 
 
 [26]
 It would be very interesting to see what would happen if our dissenting colleague's view should prevail in this case, the adopted child beincluded as "issue" for sharing in the income under the will, and if subsequently Congress should change the current "public policy" to exclude adopted children unless specifically mentioned. Thereafter, when those surviving as the measuring lives died, the corpus of the trust would vest, and no doubt we should be asked at that time to interpret this will in the light of the then existing "public policy." The adopted child would then be excluded by the application of the very rule of "current public policy" that our dissenting colleague wants to apply here.
 Stability in the interpretation of wills will be furthered by the position of the court here, not by a criterion which disposes of the estates of those forty years dead, who took the trouble to write a will in which intent can be ascertained, by the criterion of the now current public policy.
 
 
 MacKINNON, Circuit Judge (concurring):
 
 61
 I concur in the opinion of Judge Wilkey. In my view the intent of the testatrix is determinable from the four corners of the will and that is determinative of the issues in the case. Were I required to go beyond that I would also consider it unreasonable to attribute an intent to the will of the testatrix upon the basis of a policy expressed in a law that was not enacted until long after her death and long after the time when the rights of the parties first accrued. To do so is to encourage the alteration of antecedent rights and interests by subsequent legislation enacted in the name of public policy. The testatrix here died in 1930 and her son (appellee's adoptive father) died in 1943. Under the terms of the will the rights of the beneficiaries in their father's share of the estate vested (per stirpes) at that time, i. e., 1943. It was not considered that Dolores Summerlin (the adopted child) had any possible claim under the will until 1969 after our Johns decision (1968). Since appellee's claim is, as a practical matter, based upon the public policy declared in the 1954 (68 Stat. 246) and 1963 statutes, D.C.Code §§ 16-301 to 16-315 (77 Stat. 537-542), it must be admitted that if appellee had brought a suit to construe the will before that time that she would not have been successful in having her claim upheld to the income or to the corpus. And the relevant facts have not changed since 1943. I would thus not apply a new public policy to an old case. To do so in my opinion is to apply the wrong public policy because it had not been declared at any time critical to the interpretation of the intent of the testatrix in this case.
 
 
 62
 SPOTTSWOOD W. ROBINSON, III, Circuit Judge (dissenting):
 
 
 63
 For me, Johns v. Cobb,[1] decided just two years ago, furnishes the necessary guidance toward resolution of cases like the one at bar. There, by an approach sharply divergent from that which my colleagues now pursue, we held that a child adopted in 1924 took under each of two wills bequeathing income from a trust to the "issue" of his adoptive mother. One of wills was executed in 1922 by the adoptive mother's grandmother, who died in 1928; the other in 1944 by the adoptive mother's aunt, who died in 1946. Nothing within the wills indicated whether the word "issue" was intended to include adoptees, nor did the evidence extrinsic of the wills assist on that score; nor, we found, did "issue" have an established meaning proprio vigore barring relatives by adoption.[2] Lacking direction from these sources, we reasoned:
 
 
 64
 In such a situation, where the record and the inferences to be drawn therefrom do not suggest what the actual intent of the testator might have been, it is our duty to supply a reasonable intent by implication. Our guide in this undertaking is necessarily public policy, in accordance with which we assume the testators would have wished their wills to be interpreted.
 
 
 65
 The 1963 adoption statute of the District of Columbia[3] provides a clear indication of this jurisdiction's general policy toward adopted children. That statute, like the adoption statutes of many other jurisdictions, accords adopted children all the rights of natural offspring. In keeping with this policy, and in view of the unmistakable trend of judicial decisions in other jurisdictions, we held that, absent any contrary indication of the testators' actual intent, appellant should be deemed to be included within the terms of the testamentary gifts to "issue" in the wills now before us.[4]
 
 
 66
 I am no more able to discern here an actual testorial intent than was the court in Johns v. Cobb. I would, accordingly, abide the canon of construction that case lays down. My colleagues, however, conclude that "the language of the will, read in light of the surrounding circumstances, establishes that the testatrix's use of the word `issue' was not intended to include children adopted by the grandsons."[5] On that premise, "[they] do not find it necessary as a last resort to look at `public policy' to determine the testatrix's intent, as we did in Johns."[6] In my view, "the surrounding circumstances" they cite to distinguish Johns do not suffice for that purpose, and their reading of Johns as a decision resting on a "look at `public policy' to determine [testorial] intent" misses what Johns really holds. For these reasons, now to be elaborated, I respectfully dissent.
 
 
 67
 * The majority offers several broad considerations in the effort to differentiate Johns from the situation at hand. The first is that the draftsman of the will currently under examination was expert in local estate law, and so was familiar with preexisting legal definitions of "issue." This I have no reason to doubt; the will attests both the expertise and meticulous care that went into its formulation. But the draftsman in Johns, it appears, also was competent[7] and, more importantly, the point detracts from the argument. As Johns signifies, the more expert the draftsman, the less likely he would be to depend on an ambiguous word like "issue" to exclude adoptees.[8] The decisions in this jurisdiction leave its meaning, as respects adoptees, imprecise;[9] those elsewhere come out both ways.[10] I cannot assume that a careful, knowledgeable draftsman would deliberately choose "issue" in an effort to restrict residuary beneficiaries to the natural-born; rather, I would expect him to select terminology setting the clarity of his objective beyond cavil.[11] That the draftsman of the instant will was inexplicit indicates to me that at best the matter was not considered, and that a worst there was no purpose to distinguish adopted from natural children.
 
 
 68
 The second consideration upon which the majority relies is twofold. One branch of the thesis here is that the cross-remainders upon death of named life tenants without issue ran initially to named persons in the testatrix' own blood line. The other is that, since the duration of the trust is partly measured by the lives of grandsons' "issues" living at the testatrix' death, either grandson could extend the trust, if "issue" included adoptees, by adoption of persons in being during the testatrix' lifetime. These facts, my colleagues say, indicate a testorial intent to limit "issue" to those born issue.
 
 
 69
 I think these circumstances are much too weak to evidence an intent to confine the trust benefits to issue by birth. A testator normally picks as the objects of his bounty those who are closest to him; more frequently than not, those picked eo nomine just happen to be relatives by blood. So also when the gift is to a class, it is usually a class of relatives. But I am unable to extract from these commonplace, recurring facts of life an intention to discriminate among those within a designated class purely on a biological basis.[12]
 
 
 70
 Indeed, our testatrix provided that any surviving widow of either of the two grandsons was to receive, until remarriage, one-third of the net trust income to which her spouse, if living, would have been entitled either as initial life tenant or as a cross-remainderman from another beneficiary. The testatrix provided, too, that in the event of a total failure of grandsons' issue upon termination of the trust, the entire corpus of her estate is to be distributed to another stranger to the blood — The Washington Foundation — in fee simple. Less clear to me than to my colleagues, then, is an overriding testorial purpose to maintain the trust exclusively to relatives by blood.
 
 
 71
 Nor does an intent to exclude adoptees emerge from the fact that lives measuring the duration of the trust — the lives of issue in being at the time of the testatrix' death — could be unascertainable at that time because a living child might later be adopted. Trust duration is commonly congruent with the life spans of beneficiaries, who may or may not be blood relatives and whose identity may be completely unknown during the testatrix' lifetime — future spouses, for example. Any real concern is an adoption done in bad faith depriving other issue of their just shares of the trust. That is clearly not the case here. Appellee was the daughter of John Vandergrift Summerlin's third wife, six years old when the marriage occurred, and so a normal candidate for adoption.[13] In addition, she was born almost five years after the death of the testatrix, so her inclusion as "issue" cannot extend the trust.[14] Furthermore, where the adoption is in bad faith, there is adequate precedent to support judicial protection of the proper recipients.[15] Since an adoption in bad faith is unlikely,[16] did not occur here, and the court can intervene when it does, there is no reason to use its remote possibility to establish a general inference adverse to all adoptees.
 
 II
 
 72
 The majority relies, perhaps most heavily, upon the circumstance that not until long after the will was made did District of Columbia adoptees become eligible to take by intestate succession through as well as from an adoptive parent.[17] That circumstance, my colleagues say, illuminates a testorial intent to exclude adoptees from benefits under the trust. That conclusion, I submit, departs completely from Johns v. Cobb. There we expressed our disbelief "that the question is controlled by the adoption statute which was in effect at the time [the] will was drafted; `it is the will that is here being construed, and not the statute.'"[18] There, in this manner, we cleaved problems of intestate succession by adoptees from interpretative problems under wills possibly favoring adoptees. There, in like manner, we also rejected the theory, basic to the majority position, that legislation existing at execution of the will or at the testator's death has automatic relevance to testorial intent. There, the legislation aside, we could find no trustworthy evidence of intent; we pointed out that "[i]t may well be that [the testator] never considered the matter at all."[19] There, in this way, we admonished that a statute fixing the intestate succession rights of adoptees is an unreliable resource as long as testators are apt not to focus on adoptees when they make their wills.
 
 
 73
 I see nothing in the situation now before the court distinguishing it, in terms of the pertinence of prior legislation, from the situation with which we were confronted in Johns. The wills in Johns were executed in 1922 and 1944; the will here in 1929. There and here, each testatrix died prior to the District's "from and through" statute.[20] We have no greater call now to look to previous legislation for aid.
 
 
 74
 The majority view in this case, I think, misconceives the role that the "from and through" statute plays in the solution of the problem before us. In Johns, we did not resort to the current statute out of a feeling that it could bear significantly on pre-enactment testorial intention; quite obviously, it could not. We could find no satisfactory indication of intent as to whether adoptees were to be included within the term "issue," and we recognized the probability that the question had not even been considered. Thus faced with a record barren of the indicia of actual intent, we were sensitive to a "duty to supply a reasonable intent by implication."[21] And "[o]ur guide in this undertaking," we continued, "is necessarily public policy, in accordance with which we assume the testators would have wished their wills to be interpreted."[22] So it was that we laid down a canon of interpretation: "[A]bsent any contrary indication of the testator['s] actual intent, [an adopted child] should be deemed to be included within the terms of * * * testamentary gifts to `issue' * * *."[23] We explained the rationale for this canon as follows:
 
 
 75
 This result, we think, is consistent with the probable preference of the great majority of testators. We have no reason to assume that these testators would have wished to discriminate against appellant "upon a biological basis." There is no suggestion that his adoption was motivated by a desire to cut off other bequests under the wills. Had the present testators considered the problem of adopted children and decided to exclude them from their wills, they could have done so explicitly. In the absence of such a statement of intention, or any other evidence of testators' actual intent, we can perceive no reasonable basis for excluding appellant from sharing, as "issue" * * * in the proceeds of the testamentary trusts.[24]
 
 
 76
 Johns did not look to the public policy of the adoption statute with a view to determining actual testorial intent. For that purpose, the statute was explicitly held to be irrelevant, with good reason. Unlike those allowing their property to pass by intestate succession, who may consciously rely on the statutory scheme of devolution and forego wills because they cannot improve upon that scheme, those writing wills have as their objective the replacement of the scheme with a personal expression of donative intentions. Thus courts construing wills cannot presume that words otherwise equivocal were intended to derive clarification from a statute which the will was drafted to avoid.
 
 
 77
 Once it is understood that it is attributed, rather than interpreted, testorial intent which public policy is to determine, it is clear that no purpose whatsoever is served by resort to past public policy. The public policy responsible for the present adoption legislation, concretizing the "desires of the many"[25] by treating adopted and natural relatives on an equal plane, is the only appropriate reference for the judiciary. Johns so held in prescribing its canon of construction for ambiguous wills, as did the District Judge, following Johns when he construed the provisions in controversy. Measured by current policy, appellee is "issue" of her adoptive father, and in my view is entitled to share in the trust estate.
 
 
 78
 In final analysis, Johns stands for the proposition that unless it can be concluded with relative safety that the testator actually entertained an intent on the subject and that the intent is ascertainable, the judicial function properly is one of attribution to the testator of an intent realistically conceived, rather than a construction supported by doubtful vestiges of intent distilled from the particular combination of language and circumstances under scrutiny. This is but to say, as judges constantly say, that when a court lacks persuasive direction from either within or without the will, it is thrown back on a canon of construction. I see no part that bygone statutes can legitimately play in the formulation of a sound canon.
 
 
 79
 Today's decision marks what in my view is a retrogression to the uncertainties characterizing the era predating Johns v. Cobb. It means that testamentary provisions in favor of "issue" may, as respects adopted children, depend upon an assessment of testorial intent drawn from factors the true import of which is a mystery. With such an approach, we may expect all the shades of difference in opinion inevitable in any human evaluative process. We may look forward to fine decisional distinctions to which testators never gave significance. We may anticipate, too, rulings bottomed on inferences many people might deem unreal. Johns was designed to put an end to difficulties of this sort by a canon predicated on popular expectations and sound social policy. In departing from Johns, my colleagues, I fear, open the door wide for pre-Johns frustrations to again plague litigants, lawyers and courts alike.
 
 
 
 Notes:
 
 
 [1]
 131 U.S.App.D.C. 85, 402 F.2d 636 (1968), cert. denied, 393 U.S. 1087, 89 S.Ct. 876, 21 L.Ed.2d 781 (1969)
 
 
 [2]
 Id. at 86-87, 402 F.2d 637-638.
 
 
 [3]
 77 Stat. 537 (1963), D.C.Code § 16-301et seq. (1967). The "form and through" provision reenacted therein first entered the law of the District of Columbia in 1954. 68 Stat. 245 (1954), D.C.Code § 16-312 (1967).
 
 
 [4]
 Johns v. Cobb,supra note 1, 131 U.S. App.D.C. at 87, 402 F.2d at 638 (footnotes omitted). See also text infra, at note 24.
 
 
 [5]
 Supra p. 204.
 
 
 [6]
 Supra p. 204.
 
 
 [7]
 Johns v. Cobb,supra note 1, 131 U.S. App.D.C. at 86, 402 F.2d at 637. See note 8, infra.
 
 
 [8]
 Id. at 86-87, 402 F.2d at 637-638 (footnotes omitted). There we said:
 Our cases have seldom discussed the term in relation to adoption, and enough uncertainty surrounds its usage that we doubt a competent draftsman who wanted to exclude adopted children would rely on the word "issue" alone to express that purpose. "Terms such as `issue' * * * may or may not include adopted children; read alone, and apart from context, those words are ambiguous." In re Upjohn's Will, 304 N.Y. 366, 374, 107 N.E.2d 492, 495 (1952).
 
 
 [9]
 Id. at 86-87, 402 F.2d at 637-638, quoted supra note 8. My colleagues concede that, for imprecision, "issue" is not "decisive" or "determinative," although they find it "persuasive" in context. Supra p. 205.
 
 
 [10]
 See the cases collected in Annot., 86 A.L.R.2d 12, 69-84 (1962)
 
 
 [11]
 "It is not too much to ask the draftsman to address himself specifically and unambiguously to this question before finding that the exclusion of an adoptee was intended." Halbach, The Rights of Adopted Children Under Class Gifts, 50 Iowa L.Rev. 971, 980 n. 43 (1965)
 The same consideration applies with equal force, I submit, to the majority's suggestion that the fact that appellee was adopted after the testatrix' death negates testorial intent to include her as a beneficiary. Supra p. 207. The point, once again, is that the meticulous draftsman of the will in suit would not have rested on that circumstance. Those adopted after the testator's death have been permitted to take, see In re Heard's Estate, 49 Cal.2d 514, 319 P.2d 637, 643 (1957); In re Coe, 42 N.J. 485, 201 A.2d 571, 577 (1964); In re Park's Estate, 15 N.Y.2d 413, 260 N.Y.S.2d 169, 207 N.E. 2d 859, 860-862 (1965), and this court has said that it does not "attach great importance" to the time of the adoption except as it may have evidentiary bearing on good or bad faith. Johns v. Cobb, supra note 1, 131 U.S.App.D.C. at 86 n. 2, 402 F.2d at 637 n. 2.
 
 
 [12]
 There was a time in our history when limitation of land ownership to blood relatives was a policy in vogue. The ancient doctrines governing the devolution of landed estate in England, particularly fee tail, together with the doctrine of primogeniture, fitted well in a way of life grounded politically, economically and socially in a system of fuedalism, to which statutory adoption was unknown. Today, we live in a society in which adoptions are everyday occurrences, and natural children share the limelight with adoptees
 
 
 [13]
 Compare Halbach,supra note 11, at 990-992.
 
 
 [14]
 Only issue of the grandsons "living at the time of [the testatrix'] death" could do so
 
 
 [15]
 Compare Johns v. Cobb,supra note 1, 131 U.S.App.D.C. at 86 n. 2, 402 F.2d at 637 n. 2; Halbach, supra note 11, at 987-993. And see note 25, infra.
 
 
 [16]
 See Noreen v. Sparks, 92 U.S.App.D.C. 164, 204 F.2d 56 (1953). See also Bedinger v. Graybill, 302 S.W.2d 594 (Ky.1957). And see note 25,infra.
 
 
 [17]
 See note 3,supra.
 
 
 [18]
 Johns v. Cobb,supra note 1, 131 U.S. App.D.C. at 86, 402 F.2d at 637, quoting Noreen v. Sparks, 92 U.S.App.D.C. 164, 166, 204 F.2d 56, 58 (1953).
 
 
 [19]
 Johns v. Cobb,supra note 1, 131 U.S. App.D.C. at 87, 402 F.2d at 638.
 
 
 [20]
 Our testatrix died in 1930. The two involved inJohns died in 1928 and 1946. Joint Appendix, Johns v. Cobb, supra note 1, at 203, 131 U.S.App.D.C. 87, 402 F.2d 638.
 My colleagues endeavor to bolster their position by reference to a statement in the legislative history of the "from and through" statute and the nonretroactivity provision related to it. Supra pp. 208-209. Both antedated Johns v. Cobb, but the court there made no mention whatever of them although either, I think, would have altered the Johns holding if given the construction my colleagues espouse. For me, the court's silence indicates a contrary view — one which I share. To the extent that the statement reflected anything at all on the relation of succession law to wills interpretation, it was that those disliking the new "from and through" provision must change their wills to avoid it — that the new legislative policy would supplant the old in the interpretation. The nonretroactivity provision, D.C.Code § 16-315 (1967), while of course applicable to intestate succession by an adoptee, is irrelevant to the problem at hand. As is elucidated herein, the consideration important to testorial intent is not the "from and through" provision in substantive operation, but the public policy that gave birth to it.
 
 
 [21]
 Johns v. Cobb,supra note 1, 131 U.S. App.D.C. at 87, 402 F.2d at 638.
 
 
 [22]
 Id.
 
 
 [23]
 Id.
 
 
 [24]
 Id., quoting In re Estate of Coe, supra note 11, 201 A.2d at 575 (footnotes omitted).
 
 
 [25]
 "The proposed [`from and through'] law * * * brings to the foreground the growing concept that adopted children are in all respects the actual children of the adopting family. Sometimes the argument is made that in this manner a child will be sneaked in on unsuspecting grandparents but the committee believes that this situation seldom occurs. One of the members of the adoption committee of the Bar Association of the District of Columbia conducted a survey among adopting grandparents a few years ago and there was unanimity among such grandparents that they much preferred a `from and through' law. It was therefore the thought of the committee that the law should be brought into conformity with the desires of the many and the few that objected to it could specifically change their wills to the contrary. Furthermore, the proposed change is in keeping with the idea that the greatest possible protection should be given the adopted child." H.R.Rep.No. 1347, 83rd Cong., 2d Sess. 7 (1954). See, to the same effect, S.Rep. No. 1379, 83rd Cong., 2d Sess. 6 (1954). See also Halbach,supra note 11, at 985 n. 66.